ALLERGY ASTHMA TECHNOLOGY,
LTD., Plaintiff,

v.

I CAN BREATHE, INC. and Adrien
J. Bledstein, Defendants.

I Can Breathe!  Inc., Counterclaimant,

v.

Allergy Asthma Technology, Ltd.,
Counterclaim Defendant.

No. 00 C 4011.

United States District Court,
N.D. Illinois,
Eastern Division.

April 10, 2002.

Daniel E. Beederman, Allen Stewart Kirsh, Schoenberg, Fisher, Newman & Rosenberg, Ltd., Chicago, IL, for Plaintiff.

Paul E. Freehling, D'Ancona & Pflaum, Chicago, IL, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

In this litigation stemming from the total deterioration of the once amicable business relationship between Allergy Asthma Technology, Ltd. ("Allergy Asthma") on the one hand and I Can Breathe! Inc. ("I Can Breathe") and its President and sole shareholder Adrien Bledstein ("Bledstein") on the other, this Court has conducted a bench trial of Allergy Asthma's claims and I Can Breathe's counterclaim. What follows in accordance with Fed.R.Civ.P. ("Rule") 52(a) are the resulting findings of fact ("Findings") and conclusions of law ("Conclusions"). To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both of those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

### Findings of Fact [1]

1. Allergy Asthma is a Delaware corporation with its principal place of business in Morton Grove, Illinois. In August 1999 Allergy Asthma purchased the assets (including the name) of an existing Illinois corporation with the identical name. Among the products that Allergy Asthma sells and that its predecessor sold are facial masks that cover the nose and mouth of the wearer (St.¶¶ 1, 2, 4).

2. I Can Breathe is an Illinois corporation with its principal place of business in Chicago. It too sells facial masks that cover the nose and mouth of the wearer (St.¶¶ 5, 7). Its President, sole director and sole shareholder is Bledstein, who is herself an asthmatic (St.¶ 6).

3. Allergy Asthma and I Can Breathe are competitors in the sale of (a) multipurpose facial masks, which filter dust, pollen, mold and other airborne irritants, and (b) cold-weather facial masks, which serve a similar filtering function but also warm and moisturize air breathed in subfreezing temperatures (Bledstein). By any measurement—e.g., in terms of sales volume, number of employees or number of products—Allergy Asthma is much larger than I Can Breathe. Allergy Asthma sells many products in addition to facial masks, while I Can Breathe's facial masks are its only significant products (P. Exs. 1, 2; Bledstein and Krugman).

4. I Can Breathe! ® is a trademark registered with the United States Patent and Trademark Office ("PTO") and Illinois Secretary of State for I Can Breathe facial masks (D.Exs.148, 149). I Can Breathe's multi-purpose masks are made of silk, and its cold-weather masks are silk-lined. Both types of masks have adjustable ear loops and a piece of wire to seal the mask under the eyes (St. ¶ 28; D. Exs. 5, 147). In addition, I Can Breathe masks contain a patented feature (invented by Bledstein, who designed the masks for use by herself and others having respiratory difficulties) that keeps the fabric from collapsing against the wearer's nose and mouth. I Can Breathe is Bledstein's exclusive licensee of the patent (St.¶ 6). Each I Can Breathe mask has a sewn-in label identify-

---

1. Findings derived from the parties' Agreed Statement of Uncontested Facts are cited "St. ¶ —." Allergy Asthma's exhibits are cited "P.Ex.—," while I Can Breathe's are cited "D. Ex.—." Trial testimony by Bledstein or by Allergy Asthma's President Kenneth Krugman ("Krugman") is denoted by simply listing that witness' name.

ing both the trademark and the patent (D. Exs. 1, 2; P.Ex. 4).

5. Allergy Asthma facial masks are dissimilar from I Can Breathe facial masks in several important respects:

(a) Allergy Asthma's facial masks are made of a material known as Pristine polyester and contain no silk. Allergy Asthma never sold any masks containing silk except during the time that it was selling I Can Breathe masks (St.¶ 14).

(b) Allergy Asthma's facial masks are sold under the name "AllerTech ®," a name that is not registered for facial masks with the PTO (D.Ex. 152).

(c) Allergy Asthma's facial masks are not patented and contain no label (P.Ex. 3). Pristine polyester is patented for use in mattresses and pillow covers (U.S. Patent No. 6,277,770), not for facial masks (P.Ex. 43).

(d) Allergy Asthma's facial masks do not contain a wire to seal the mask against airborne irritants, nor do they contain the patented feature of I Can Breathe facial masks, thus creating the potential (or indeed the actuality) that a person wearing the Allergy Asthma mask will have the mask sucked against the wearer's mouth and nostrils when he or she inhales (D. Exs. 5, 147; P.Ex. 3; Bledstein).

There are however several characteristics that the masks have in common: Allergy Asthma's masks are shaped to look like I Can Breathe masks and are advertised to function like I Can Breathe masks (D. Ex. 5; P. Exs. 1, 2; Bledstein).

6. At all relevant times:

(a) Both Allergy Asthma and I Can Breathe contracted out (and continue to contract out) the manufacturing of their facial masks (Krugman and Bledstein).

(b) Both Allergy Asthma and I Can Breathe sold (and continue to sell) their masks to wholesale and retail customers (id.)

(c) All of I Can Breathe's retail sales were and are solely by mail order (id.).

7. Allergy Asthma was I Can Breathe's principal wholesale customer for several years ending in early 2000 (St.¶ 13). All of their transactions were documented solely by the exchange of purchase orders and invoices, with no other written agreements or contracts between the companies (St. ¶ 10). Despite Bledstein's requests on numerous occasions that Allergy Asthma use the "I Can Breathe! ®" brand name, the latter's catalog and website referred to I Can Breathe as "ICB ™," though there is no such registered trademark (Bledstein and Krugman).

8. In 1996 Allergy Asthma's President Krugman attempted without success to persuade I Can Breathe to grant Allergy Asthma an exclusive irrevocable license of I Can Breathe's patent (D.Ex. 151). Thereafter Allergy Asthma continued to be a nonexclusive purchaser of (though it was the principal customer for) I Can Breathe's patented masks. Early in 1999 I Can Breathe made clear to Allergy Asthma that other retailers in addition to Allergy Asthma would be listed on I Can Breathe's website (D. Ex. 153; Bledstein).

9. During the entire period that I Can Breathe sold silk and silk-lined facial masks to Allergy Asthma, it was Allergy Asthma's responsibility to package the masks for resale. I Can Breathe masks are intended primarily for a vulnerable population with respiratory problems. Relatedly, I Can Breathe needs to protect itself against possible product liability claims brought by consumers who have not been adequately informed as to the proper care and use of I Can Breathe masks. For those reasons, I Can Breathe provided Allergy Asthma with a number of suggested package inserts that described the products, provided care instructions and

included information for appropriate use (Bledstein).

10. Allergy Asthma never expressed (and indeed never experienced) dissatisfaction with I Can Breathe facial masks (Bledstein). When in late 1999, without I Can Breathe's knowledge, it nonetheless decided to shift to masks made from Pristine polyester (Krugman; see Finding 14)[2] —masks that were much cheaper and of lower quality, and lacking a number of the advantages provided by I Can Breathe masks, Allergy Asthma ordered from a printer package inserts for facial masks that it marketed under the name "Aller-Tech ®" (Krugman) and that, when used in the sale of those masks, conveyed materially misleading information (D.Ex. 22):

(a) Allergy Asthma's order for package inserts for an "AllerTech ®" multi-purpose facial mask showed Pristine polyester as the fabric content but stated that the mask should be hand washed "in cool water with a mild detergent formulated for silk." To the contrary, in contrast to silk, Pristine polyester fabric is designed to be machine-washed in hot water (P. Exs. 5, 43 at P 295–96).

(b) Allergy Asthma's order for package inserts for an "AllerTech ®" cold weather mask described the contents as "polar fleece with a silk lining" (P.Ex. 5; D. Ex. 28). That was totally false as to the Pristine polyester masks.

(c) When those package inserts were delivered to Allergy Asthma, copies were included in *all* packages of masks shipped by Allergy Asthma (both its I Can Breathe masks remaining on hand and its newly obtained Pristine polyester masks) (D. Exs. 22, 28; Krugman).

At the same time Allergy Asthma, without so advising Bledstein, discarded the package inserts that she had delivered to Allergy Asthma for proposed inclusion with I Can Breathe facial masks—rather than including those inserts in the packages containing such masks (or at a minimum conferring with Bledstein to resolve any objections that Krugman had to the form or content of such inserts) (Krugman and Bledstein). By omitting any I Can Breathe package insert from packages of I Can Breathe masks, and by inserting information relating to Pristine polyester masks instead (information that was materially misleading when the package contained an I Can Breathe mask), Allergy Asthma deceived facial mask consumers, a particularly vulnerable population, and created a risk to I Can Breathe of product liability (Bledstein).

11. In mid-December 1999, following a successful effort to obtain catalog and website listing of facial masks by Retired Persons Services, the retail pharmacy unit of AARP,[3] Allergy Asthma shipped to RPS' telecenter some samples of I Can Breathe facial masks. As indicated by Finding 10, those samples were accompanied by an insert that represented the fabric content as including Pristine polyester, when in fact the masks were made of silk and contained no Pristine polyester (P.Ex. 11A; D. Ex. 92; Krugman).

12. In late December 1999 RPS began to advertise I Can Breathe facial masks in RPS' catalog and on its website (P.Ex. 11A; D. Ex. 89):

(a) RPS denominated the multi-purpose silk facial masks as Product No.

---

**2.** It should be made clear that Allergy Asthma had a right to make that change. What it did *not* have the right to do, however, was to engage thereafter in the misleading activity described in later Findings, or to fail to alert *its key customer referred to in Finding 11 to* the change so as to prevent that customer's

catalogs and website from continuing to convey what then became similarly misleading information.

**3.** For convenience those organizations will be referred to collectively as "RPS."

M6214 and the silk-lined cold weather facial masks as Product No. M6142 (P.Ex. 12; D. Exs. 89–91).

(b) In fact the products pictured in RPS' catalog and on its website were I Can Breathe facial masks, and the text described I Can Breathe masks. Allergy Asthma furnished the pictures and text to RPS (P.Ex. 12; D. Exs. 89–91; Krugman and Bledstein).

(c) When Allergy Asthma then stopped shipping I Can Breathe facial masks to RPS and shipped only Pristine polyester masks (see Finding 14), Allergy Asthma took no steps to alert RPS to the fact that the previously-furnished pictures and text now depicted and described different (and more expensive and higher quality) products from the ones that Allergy Asthma was now providing for sale by RPS.

(d) Accordingly, throughout the period that RPS was a customer of Allergy Asthma, RPS falsely (though innocently, for the fault was Allergy Asthma's) continued to advertise I Can Breathe masks by picture and description (P.Ex. 12; D. Exs. 89–91).

13. At all relevant times until October 2000, Allergy Asthma's catalog (and, for much of that period, Allergy Asthma's website) advertised I Can Breathe silk and silk-lined facial masks for sale (P.Ex. 1; D. Exs. 138–39):

(a) All of the products pictured and described there were I Can Breathe facial masks, with the silk multi-purpose mask being denominated Product No. D2700 and the silk-lined cold weather mask being denominated Product No. D2500 (P.Ex. 1; D. Exs. 138–39).

(b) Allergy Asthma's initial order for its 1999 catalog was 500,000 copies (D.Ex. 23).

14. In December 1999 Allergy Asthma ordered Pristine polyester facial masks from J. Lamb, Inc., also known as Phil-mont Manufacturing Co. ("Lamb") (P.Ex. 10):

(a) Lamb's first delivery of masks was made to Allergy Asthma in about February 2000 (P.Ex. 10).

(b) Through August 2000 Allergy Asthma purchased from Lamb approximately 1,000 Pristine polyester multi-purpose masks and 800 Pristine polyester cold weather masks (P.Ex. 10 at P 1526, 1530 and 1537).

(c) In September 2000 Allergy Asthma purchased from Lamb 650 additional Pristine polyester multi-purpose masks but no Pristine polyester cold weather masks (P.Ex. 10 at P 1533 and 1534).

(d) In December 2000 and January 2001 Allergy Asthma purchased from Lamb 200 more Pristine polyester multi-purpose masks and 800 more Pristine polyester cold weather masks (P.Ex. 10 at P 1535 and 1536).

15. In early March 2000, without I Can Breathe's knowledge, Allergy Asthma stopped shipping I Can Breathe silk and silk-lined facial masks to wholesale and retail customers who ordered I Can Breathe masks pictured and described in Allergy Asthma's catalog and on its webpage. Instead Allergy Asthma began shipping its own Lamb-manufactured Pristine polyester facial masks to those customers (Krugman and Bledstein).

16. Until late March 2000 all invoices issued by Allergy Asthma to wholesale and retail customers who ordered I Can Breathe multi-purpose facial masks identified the masks being sold and shipped as Product No. D2700 and as "silk multi-purpose masks." From late March until October 2000, in almost every instance where Allergy Asthma shipped its Pristine polyester multi-purpose masks to customers ordering I Can Breathe silk multi-purpose masks, the invoice continued to identify the masks being sold and shipped

as Product No. D2700, though the word "silk" was no longer included (P.Ex. 11A; D. Exs. 32–40, 42, 43, 125; Krugman). In like fashion, from sometime in March until October 2000 Allergy Asthma's invoices for cold weather facial masks sold and shipped to customers ordering I Can Breathe silk-lined masks continued to identify the masks being sold and shipped as Product No. D2500, even though Allergy Asthma was then shipping Pristine polyester masks (P.Ex. 11A; Krugman).

17. All of RPS' facial mask orders to Allergy Asthma were likewise placed to call for Product Nos. D2700 and D2500 (P.Ex. 11A). Despite the fact that only I Can Breathe silk and silk-lined facial masks continued to be pictured and described on RPS' website and in its catalogs, beginning sometime in March 2000 Allergy Asthma shipped to RPS only Pristine polyester masks with the same numbers, D2700 and D2500. All masks shipped by Allergy Asthma to RPS were prepackaged for resale (Krugman).

18. Almost immediately after Allergy Asthma began shipping its Pristine polyester facial masks to customers who believed they were ordering I Can Breathe masks, customers began to complain of confusion and displeasure:

(a) As early as mid-March 2000 customers began returning the Pristine polyester masks to Allergy Asthma, complaining that they could not breathe through the masks or that the masks delivered to them were not the ones advertised (D.Exs.29, 31).

(b) I Can Breathe's limited search of Allergy Asthma's files for purposes of this litigation disclosed that during the period March to November 2000 more than 20 Allergy Asthma customers complained about and returned the polyes-

ter masks for refunds (D. Exs. 29, 31–50; Bledstein).

19. Among the customers deceived by Allergy Asthma's misrepresentations in its marketing materials were Cheryl Coston ("Coston"), Margaret Snow ("Snow") and Debra Greane ("Greane"):

(a) In mid-March 2000 I Can Breathe received an e-mail from Coston, an irate Allergy Asthma customer who lives in Fairdealing, Missouri.[4] Coston's e-mail stated that she had ordered I Can Breathe silk facial masks from Allergy Asthma but had received Pristine polyester facial masks. That was I Can Breathe's first knowledge that Allergy Asthma was shipping its Pristine polyester masks to customers who had ordered I Can Breathe silk masks (P. Exs. 15–17; Bledstein).

(b) In mid-March 2000 Snow, an equally irate RPS customer who lives in Anaconda, Montana, called Allergy Asthma to complain that she had ordered an I Can Breathe silk-lined cold weather facial mask from RPS but had received a polyester-lined facial mask. Snow then called I Can Breathe, told Bledstein what had happened and ordered a silk-lined cold weather mask (P. Exs. 15–17; D. Exs. 31; Bledstein).

(c) In mid-November 2000 Greane, an Allergy Asthma customer who lives in Madison, Wisconsin, called Allergy Asthma to order a new I Can Breathe mask to replace the one that she had misplaced. Instead she was sent a Pristine polyester mask. Greane tried it, concluded that it appeared to be a different and unsatisfactory product and called Allergy Asthma to complain. Greane was told that the type of mask she had misplaced was no longer available and was invited to return the mask for a refund, which she did. Later she locat-

4. Should Coston therefore have been doubly entitled to fair dealing from Allergy Asthma?

ed her I Can Breathe mask and observed the differences (D. Ex. 47; Greane Dep. 8–10, 15–16, 26–28).

20. For a brief period of time in the spring of 2000, I Can Breathe's website (quoting Coston's e-mail verbatim and summarizing Snow's comments) cautioned facial mask customers truthfully that Allergy Asthma was shipping its polyester facial masks to persons ordering I Can Breathe silk and silk-lined facial masks (P. Exs.15–17). Nothing contained on I Can Breathe's website was deceptive, false or misleading.

21. In late June 2000, four months after Allergy Asthma had stopped shipping I Can Breathe facial masks and had been shipping only Pristine polyester masks, Allergy Asthma ordered 24,000 reprints of its 1999 catalog with its continued depictions and descriptions of I Can Breathe masks, and without either pictures or descriptions of Pristine polyester masks—the only facial masks then being sold by Allergy Asthma (D. Ex. 24; Krugman).

22. During the spring of 2000, after hearing from Snow, I Can Breathe communicated with RPS as to the facial masks that it was selling:

(a) One of the earliest of those communications involved I Can Breathe's request for written information about the masks RPS was offering for sale. In response RPS faxed to I Can Breathe a "Product Knowledge Inquiry" form that provided a detailed description of the masks. That form, however, did not accurately describe either I Can Breathe

masks or Allergy Asthma masks (D. Ex. 72; Bledstein).

(b) I Can Breathe then wrote and phoned RPS personnel to express concern about RPS' advertising of silk facial masks for sale when it was shipping Pristine polyester facial masks instead (P. Exs. 29–33, 35, 37, 38; Bledstein).

(c) In one of those communications I Can Breathe wrote (1) that Allergy Asthma's masks "may be a danger to the health of seniors," (2) that I Can Breathe was investigating the possibility that Allergy Asthma had infringed I Can Breathe's patent and (3) that Allergy Asthma had been guilty of "bait-and-switch tactics" (P. Exs. 29–33, 35, 37, 38; Bledstein). Each of those statements was true, as further explained in Finding 23.

(d) Nothing stated by I Can Breathe in its letters to or its phone conversations with RPS was deceptive, false or misleading.

23. This Finding elaborates on the truthfulness of I Can Breathe's statements referred to in Finding 22(c). As to the statement that "Allergy Asthma's masks may be a danger to the health of seniors," that was fully justified by the fact that the Allergy Asthma mask, when held in a way that provided the same kind of assurance against the introduction of ambient air that is provided by I Can Breathe's wire structure (a structure that is absent in Allergy Asthma's masks), led to the mask being inhaled so as to block the nose and mouth.[5] As for the possibility that the Allergy Asthma masks had infringed I Can

---

**5.** Allergy Asthma's counsel has sought to respond by arguing that it was not shown that the same effect is produced when his client's mask is not held in that fashion (so that no vacuum is created by the wearer's inhalation). That argument is both flawed and ironic: After all, the absence of the wire structure is disadvantageous to the allergic person, who is

thus placed at risk because the allergens present in the ambient air can readily be inhaled around the mask (defeating the very purpose for which such people wear masks). Hence the statement that "Allergy Asthma's masks may be a danger to the health of seniors" is credible in more ways than one.

Breathe's patent, that was justified by the potential (based on Bledstein's discussion with I Can Breathe's patent counsel) that the Allergy Asthma stitched seam covering the nose might operate under the then-existing version of the doctrine of equivalents to infringe the corresponding patented element in the I Can Breathe mask. Finally, as to the asserted "bait and switch tactics," [6] that characterization was entirely reasonable in light of the information that Bledstein had learned as to situations in which customers had ordered facial masks on the understanding that I Can Breathe masks would be provided them, only to receive the lower-cost (and from the customers' point of view, less desirable) Pristine polyester masks instead:

(a) Allergy Asthma's failure to take the steps necessary to eliminate the continued use by RPS of photographs and descriptions that depicted I Can Breathe masks, even after Allergy Asthma had switched to the Pristine polyester masks in its sales to RPS, may fairly be viewed as the cause of consumer deception in that respect. In view of the relationship between Allergy Asthma as supplier and RPS as purchaser of the masks, Allergy Asthma will not be heard to argue (as it has) that it had no responsibility for the RPS catalog or website.

(b) Although it would not be reasonable to have required Allergy Asthma to redo its own existing catalog (a 500,000 copy printing) to reflect its product change during the one-year period when the catalog was in use, Allergy Asthma

did have the obligation to apprise anyone who ordered the facial mask from its catalog that the product that was depicted and described there was no longer the one that it was selling.

24. In response to I Can Breathe's correspondence and phone calls, RPS communicated with Allergy Asthma by letter and by phone. Among the false statements Allergy Asthma then made to RPS was that its facial masks had been approved by the manufacturer of Pristine polyester (a matter as to which Allergy Asthma has provided no evidence that the manufacturer of Pristine polyester has tested, let alone approved, Allergy Asthma's facial masks) and that no one but Bledstein's friends and relatives recommended the use of I Can Breathe facial masks (a groundless assertion tending to improperly disparage I Can Breathe's product) (P. Exs. 25, 28, 43; D. Ex. 85; Krugman and Bledstein).

25. In October 2000 Allergy Asthma issued a new catalog that did not advertise I Can Breathe facial masks and that for the first time pictured and described Pristine polyester facial masks. It was then that Allergy Asthma—also for the first time—changed its product numbers to eliminate the potential for misleading customers in that respect, by referring to its multi-purpose mask as Product No. D2701 and to its cold weather mask as Product No. D2501 (P.Ex. 2; D. Exs. 138–39; Krugman).

---

6. *Black's Law Dictionary* 137 (7th ed.1999) defines "bait and switch" this way:

> A sales practice whereby a merchant advertises a low-priced product to lure customers into the store only to induce them to buy a higher-priced product.

Although what I Can Breathe's Bledstein had learned in this instance represented a different scenario—the palming-off of a less costly product to a customer who believed that the desired product (more costly to manufacture) would be furnished—the "switch" part of the characterization was common to the two situations, and the difference in the particulars of consumer deception does not give rise to potential liability on the part of I Can Breathe or Bledstein. Indeed, Allergy Asthma's misleading conduct fits well within the FTC's definition of "bait advertising"—see Conclusion 10.

26. Allergy Asthma did not purchase any I Can Breathe masks after February 2000 (Krugman and Bledstein). During 2000 Allergy Asthma sold I Can Breathe silk multi-purpose and silk-lined cold weather masks, which it had purchased both before 2000 and during the first two months of 2000, at these retail prices (P.Ex. 2; D. Ex. 138):

| | |
|---|---|
| Adult cold weather masks | $19.95 |
| Child cold weather masks | 14.95 |
| Multi-purpose masks | 14.95 |

27. Medical SelfCare ("SelfCare") was one of Allergy Asthma's wholesale customers for facial masks (D. Ex. 125; Krugman). In January 2000 Allergy Asthma sold and shipped 24 I Can Breathe silk multi-purpose facial masks to SelfCare, accompanied by the same package inserts (which incorrectly referred to the contents as Pristine polyester) that had accompanied the samples sent to RPS. Although Allergy Asthma paid I Can Breathe $10.40 for each of the 24 masks, Allergy Asthma charged SelfCare $6.50 each (substantially below Allergy Asthma's cost) (D.Ex. 125).

28. From December 1999 through February or early March 2000, Allergy Asthma sold and shipped to RPS an aggregate of 390 I Can Breathe silk multi-purpose facial masks and 528 I Can Breathe silk-lined cold weather facial masks. Allergy Asthma charged RPS $10 each for the multi-purpose masks and $11 each for the cold weather masks, below Allergy Asthma's respective costs of $10.40 and $11.40 (P.Ex. 11A at P 491, 492, 824, 842, 851, 865, 867, 908, 916, 922, 939, 942 and 945).

29. This Finding summarizes the wholesale prices at which Allergy Asthma sold I Can Breathe silk and silk-lined facial masks during 2000 (P.Ex. 11A; D. Ex. 125):

| | RPS | Self–Care |
|---|---|---|
| Adult silk-lined cold weather masks | $11 | none |
| Silk multi-purpose masks | 10 | $6.50 |

30. During 2000 Allergy Asthma paid Lamb $3 each for Pristine polyester multi-purpose masks and $3.50 each for the Pristine polyester cold weather facial masks (P.Ex. 10). Allergy Asthma did not purchase Pristine polyester cold weather masks for children. Allergy Asthma sold those masks at these retail and wholesale prices (Krugman):

| | Retail Prices | Prices to RPS |
|---|---|---|
| Adult cold weather masks | $19.95 | $11 |
| Multi-purpose masks | 14.95 | 10 |

31. From December 3, 1999 through January 17, 2001 Allergy Asthma purchased from Lamb an aggregate of 1,850 Pristine polyester multi-purpose facial masks and 1,600 cold weather polyester-lined facial masks (P.Ex. 10 at P 1526, 1530, 1533, 1534, 1535, 1536, and 1537):

(a) From February through September 2000 Allergy Asthma sold and shipped to RPS an aggregate of 275 of those multi-purpose masks and an indeterminate number of those cold weather masks (P.Ex. 11A at P 487, 831, 835, 838, 885, 897, 901, 905, 911 and 1344).

(b) Allergy Asthma made a gross profit of $7 ($10 minus $3 cost) on each of the 275 multi-purpose masks, or an aggregate gross profit of $1,925 (P. Exs. 10 and 11A).

(c) Allergy Asthma made a gross profit of $11.95 ($14.95 minus $3 cost) on each of the multi-purpose masks sold at retail and $16.45 ($19.95 minus $3.50 cost) on each of the cold weather masks sold at retail (*id.*).

(d) Retail sales of the 1,575 multi-purpose masks not sold to RPS (2,150 minus the 275 sold to RPS) would produce an aggregate gross profit of $18,821.25 (1,575 × $11.95). Retail sales of all 1,600 cold weather masks purchased from Lamb[7] would produce an aggregate gross profit of $26,320.

(e) Accordingly Allergy Asthma's total gross profit from the sales of the Pristine polyester masks during that time frame, the sum of the amounts in Finding 31(b) through (d), came to $47,066.25.

32. Allergy Asthma's effort to prove damages in support of its own claims is based on its assertedly lost profits from sales that it claims it would have made but for I Can Breathe's and Bledstein's conduct (see its most recently tendered Supplemental Statement of Facts ("AA Supp.") ¶¶ 91 and 95). These Findings and the ensuing Conclusions establish that none of the complained-of conduct has been wrongful as to Allergy Asthma so as to be actionable—but what is relevant for purposes of I Can Breathe's Counterclaim is that Allergy Asthma has mistakenly calculated such profits on the sale of goods not only by deducting the cost of those goods but also by deducting (a) all other components that enter into a calculation of corporate gross margin plus (b) its ratable overall operating expenses as a percentage of the total corporate sales. As this Court pointed out to both sides' counsel during post-trial argument, the true profit on added sales or lost sales takes into account not average across-the-board expenses but only *incremental* expenses: After all, a host of expenses such as rent, officers' salaries, payroll and maintenance costs (to name just a few) are not increased at all

by the purchase of a few thousand more dollars of goods for later resale. Yet no evidence has been proffered by Allergy Asthma that goes to establishing the real profits at issue. If Allergy Asthma were to have prevailed on any aspect of its own claim (as it has not), its calculation of a claimed lost profit equal to 7.2% of net sales would have understated its damages figure. But as the record stands, the only properly established deduction from Allergy Asthma's incremental gross sales is the cost of goods sold. Hence the amount in Finding 31(e) represents the measure of I Can Breathe's recoverable damages under Lanham Act § 35(a), 15 U.S.C. § 1117(a) (see Conclusion 4).

33. Even though the findings to this point, coupled with the Conclusions that follow, operate to defeat Allergy Asthma's claims in their entirety because of its failure to demonstrate any wrongful conduct by I Can Breathe and Bledstein, this further Finding is in order to identify an additional flaw in Allergy Asthma's case. Its own submissions claim as damages only $7,484.03 in the way of net profit on asserted lost sales to RPS (see its AA Supp. ¶ 95), a figure that it asks to have trebled because it speculates that it also lost sales from product placement in future AARP/RPS catalogs and on its website (AA Supp. ¶ 96). That however proceeds from the asserted premise that RPS' decision not to do further business with Allergy Asthma was attributable to the allegedly wrongful conduct of I Can Breathe and Bledstein. And Allergy Asthma simply has not proved that—indeed, even though representatives of RPS were of course available to it as potential witnesses, Allergy Asthma offered nothing from what would seem

---

**7.** Because Allergy Asthma must be held responsible for the inadequacy of its records to show sales of any of those masks to RPS, the gross profit calculation must be increased in I

Can Breathe's favor (a principle exemplified by the seminal opinion in *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–65, 66 S.Ct. 574, 90 L.Ed. 652 (1946)).

to have been that impartial source as to RPS' reason or reasons for not continuing those business relations. It is surely plausible—in fact, it appears more probable from the evidence—that RPS looked at the information that it had received as to the nature of Allergy Asthma's misleading activities and simply decided that it therefore had no desire to number Allergy Asthma among its suppliers for that reason. This is a situation in which Allergy Asthma had the burden of proof and simply failed to discharge it.

34. Finally, I Can Breathe and Bledstein have tendered a proposed Finding 50 to the effect that Allergy Asthma "conducted this litigation in a manner designed to add insult to I Can Breathe's injury," setting out several bases for that assertion. In part the conduct that they ascribe to Allergy Asthma in that respect is not before this Court (such as what is said to be "an insulting and harassing deposition" of Bledstein's neighbor "for which there was no excuse"). But this Court does find that this litigation has all the earmarks of having been motivated by a desire on Allergy Asthma's part to impose injustice on I Can Breathe and Bledstein, rather than to obtain justice for itself. Allergy Asthma was no doubt wounded by its loss of what it hoped might develop into a major account with RPS. But Allergy Asthma was (and is) unwilling to recognize that the most likely cause of that loss was its own conduct, brought to RPS' attention by I Can Breathe through Bledstein (as was their right). Allergy Asthma's effort to punish Bledstein and her company for having done so is not, of course, the first time that a whistleblower has ended up as the target of retaliatory action.

### Conclusions of Law

1. This Court has jurisdiction (a) under 15 U.S.C. § 1121(a) over Allergy Asthma's claim for violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a)) and (b) under 28 U.S.C. §§ 1338(b) and 1367(a) over Allergy Asthma's claims for violation of Illinois Consumer Fraud and Deceptive Business Practices Act § 2 (815 ILCS 505/2) ("Consumer Fraud Act") and Illinois Uniform Deceptive Trade Practices Act § 2 (815 ILCS § 510/2) ("Deceptive Trade Practices Act") and for common law defamation and unfair competition. This Court has jurisdiction under corresponding auspices over I Can Breathe's counterclaims for violation of Section 43(a) of the Lanham Act § 43, Consumer Fraud Act § 2 and Deceptive Trade Practices Act § 2 and for common law unfair competition, breach of contract and account stated. I Can Breathe's claims for breach of contract and account stated were dismissed before trial.

2. All of the parties are citizens and residents of the Northern District of Illinois, and the acts of which Allergy Asthma and I Can Breathe complain took place here. Venue in this district exists under 28 U.S.C. § 1391(b).

3. *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir.1999)(footnote and numerous citations omitted) explains what either claimant must demonstrate in order to prove a violation of Lanham Act § 43(a) under the circumstances of this case:

Under the federal Lanham Act, which generally proscribes the false description of goods and their origins, the plaintiff must show that the defendant (1) made a false or misleading statement, (2) that actually deceives or is likely to deceive a substantial segment of the advertisement's audience, (3) on a subject material to the decision to purchase the goods, (4) touting goods entering interstate commerce, (5) and that results in actual or probable injury to the plaintiff.

4. Lanham Act § 35(a) (15 U.S.C. § 1117(a)), the corresponding damages

provision, specifies that when a violation of Lanham Act § 43(a) has been established:

> the plaintiff shall be entitled...to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. In assessing the profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages, the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

5. In this instance both Allergy Asthma in its Complaint and I Can Breathe in its Counterclaim have sought to call Lanham Act § 43(a), and hence Lanham Act § 35(a), to their aid. What has been set out in the Findings amply explains why Allergy Asthma is unsuccessful and why I Can Breathe is successful in doing so. What follows in these Conclusions, then, sets out the operative legal principles that provide both the yardstick for those determinations and the measure of I Can Breathe's recovery.

6. In those respects several portions of the extended and thoughtful opinion by Judge Ripple in *Sands, Taylor & Wood v. The Quaker Oats Co.*, 34 F.3d 1340 (7th Cir.1994) provide useful guidance for the awarding of appropriate relief here:

> Consequently, the courts have required that the final remedy imposed under

section 35(a) provide a sufficient deterrent to ensure that the guilty party will not return to its former ways and once again pollute the marketplace.

\* \* \* \* \* \*

Our circuit has recognized that the need for deterrence is an important dimension of section 35(a).

\* \* \* \* \* \*

A year later, Judge Eschbach, writing for the Court in *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.*, 906 F.2d 1202, 1205 (7th Cir.1990), noted that many of the remedies available under the Lanham Act "flow not from the plaintiff's proof of its injury or damage, but from its proof of the defendant's unjust enrichment or the need for deterrence."

\* \* \* \* \* \*

In *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738 (7th Cir. 1985), we dealt with this tension in rather explicit terms. We stated that "[t]he trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party." *Id.* at 744.

\* \* \* \* \* \*

A further cautionary note was sounded in *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir.1994). There the court, through the pen of Judge Cummings, emphasized that any monetary award ought to be grounded in either an ascertainable loss of the plaintiff or a benefit accruing to the defendant on account of its infringement. *Id.* Moreover, it described the enhancement of an award under this section as a method by which a fair recovery might be approximated when damages and profits are not easily ascertainable. *Id.*

And relatedly *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1095–96 (7th Cir.1994) (citations omitted) teaches:

> Disgorgement initially developed as a remedy to provide a plaintiff relief in equity, to serve as a proxy for damages, or to deter the wrongdoer from continuing his violations. The variety of circumstances in which a court may award disgorgement by no means indicate that the district court is required to award disgorgement. Contrary to BASF's assertions that disgorgement of wrongful profits is the "norm" in a Lanham Act case, disgorgement is most appropriate if damages are otherwise nominal.

██ 7. In this instance, as already held, Allergy Asthma is not entitled to relief against either I Can Breathe or Bledstein. On the other side of the coin, though I Can Breathe's own damages are difficult to quantify, the considerations of deterrence well described in *Sands, Taylor & Wood* and the concept of disgorgement as described in *BASF* call for an award to I Can Breathe on its Counterclaim against Allergy Asthma in an amount equal to Allergy Asthma's total gross profits of $47,066.25 referred to in Finding 31(e). This Court further concludes that enhancing (let alone trebling) that amount, as Section 1135(a) permits and I Can Breathe requests, would be unduly punitive, so that possible added relief is rejected. Accordingly Allergy Asthma is ordered to pay the sum of $47,066.25 plus attorneys' fees (of which more later) to I Can Breathe on the latter's Counterclaim.

8. As for the Consumer Fraud Act, its Section 10a (815 ILCS 505/10a) provides in relevant part:

> Any person who suffers actual damages as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion, may award actual economic damages or any other relief which the court deems proper.

For purposes of liability under that statute, this Court has held in *Recreation Servs., Inc. v. Odyssey Fun World, Inc.*, 952 F.Supp. 594, 597 (N.D.Ill.1997) that the claimant need not be the one who was deceived—it suffices that defendant intended to deceive others (see that statute's Section 2 (815 ILCS 505/2)). This Court adheres to that ruling here.

██ 9. As is true of Allergy Asthma's unsuccessful Lanham Act claim, the Findings confirm that its Consumer Fraud Act claim must fail as well. As for I Can Breathe's corresponding claim, it is true that Allergy Asthma's conduct in continuing to depict and describe I Can Breathe's masks even after Allergy Asthma was in fact selling the Pristine polyester products instead constituted a clear violation of the Consumer Fraud Act. This Court nevertheless holds that the remedy already ordered in Conclusion 7 need not be enhanced to provide adequate relief for I Can Breathe because of that violation—in effect, any remedy under the Illinois statute would duplicate the like relief afforded under the Lanham Act. One exception is worth mentioning: Allergy Asthma's wilful violation of that state statute provides added support for the award of attorneys' fees referred to in Conclusion 7 (in that respect, see the statute's Section 10a(c) (815 ILCS 505/10a(c))).

10. As for the Deceptive Trade Practices Act, Illinois courts interpreting that statute have expressly applied the regulations promulgated under Section 5(a) of the Federal Trade Commission ("FTC") Act—see, e.g., *Garcia v. Overland Bond & Inv. Co.*, 282 Ill.App.3d 486, 493, 218 Ill. Dec. 36, 668 N.E.2d 199, 204–05 (1996). In that respect, Section 5(a) prohibits bait-and-switch advertising, a prohibition that is elaborated upon in the FTC Guides

Against Bait Advertising, 16 C.F.R. § 238.0 in this fashion:

> Bait advertising is an alluring but insincere offer to sell a product or service which the advertiser in truth does not intend or want to sell. Its purpose is to switch consumers from buying the advertised merchandise, in order to sell something else, usually at a higher price or on a basis more advantageous to the advertiser. The primary aim of a bait advertisement is to obtain leads as to persons interested in buying merchandise of the type so advertised.

> \* \* \* \* \* \*

> No advertisement containing an offer to sell a product should be published when the offer is not a bona fide effort to sell the advertised product.

> \* \* \* \* \* \*

> No statement or illustration should be used in any advertisement which creates a false impression of the . . . quality, make, value, . . . usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another.

11. Just as with Allergy Asthma's other claims, it has failed under the Findings in its attempt to invoke the Deceptive Trade Practices Act. As for I Can Breathe, the description in Conclusion 10 accurately portrays Allergy Asthma's conduct as set out in the Findings. But just as stated in Conclusion 9, this Court again holds that the remedy ordered in Conclusion 7 need not be enhanced to provide adequate relief for I Can Breathe. And the parallel to Conclusion 9 also extends to the exception providing added support for an attorneys' fee award—see that statute's Section 3 (815 ILCS 510(3)).

12. Allergy Asthma's common law defamation claim, like its federal and state statutory claims, loses too. In that regard Allergy Asthma falls at the first hurdle: the need to prove an actionable falsehood. As the Findings have set out in detail, Bledstein's (and hence I Can Breathe's) critical comments about Allergy Asthma satisfy the required standard of "substantial truth"—the legal test under Illinois law as described in *Wynne v. Loyola Univ. of Chicago*, 318 Ill.App.3d 443, 451, 251 Ill.Dec. 782, 741 N.E.2d 669, 675–76 (2000) and cases cited there, including this Court's opinion in *Hollymatic Corp. v. Daniels Food Equip., Inc.*, 39 F.Supp.2d 1115, 1118 (N.D.Ill.1999).

13. Finally as to both sides' claims of common law unfair competition, both the nonliability on the part of Bledstein and I Can Breathe on Allergy Asthma's Complaint and the liability on the part of Allergy Asthma on I Can Breathe's Counterclaim are really subsumed under what has already been said as to their respective Lanham Act § 43(a) claims. Hence that final claim on Allergy Asthma's part is rejected and I Can Breathe's is upheld, with no additions being required to the results already prescribed in these Findings and Conclusions.

14. As suggested earlier in the Findings and Conclusions, both (a) the nature of Allergy Asthma's conduct of this litigation and (b) its motivations for attempting to convert a problem of its own making into a lawsuit asserting multiple claims despite minor potential damages even if it *were* successful justify characterizing this as an "oppressive suit" on its part within the meaning of *Door Sys., Inc. v. Pro–Line Door Sys., Inc.*, 126 F.3d 1028, 1032 (7th Cir.1997). That entitles I Can Breathe and Bledstein, as prevailing parties, to the recovery of their attorneys' fees under Lanham Act § 35(a) (15 U.S.C. § 1117(a)). And as Conclusions 9 and 11 indicate, even if that were not the case the same conclusion is separately bolstered by like considerations applicable to the state

statutory claims at issue here, each of which independently supports an award of attorneys' fees.

*  *  *  *  *  *

Judgment is ordered to be entered in favor of I Can Breathe and against Allergy Asthma in the sum of $47,066.27. Judgment is further ordered to be entered dismissing all of Allergy Asthma's claims with prejudice. Lastly, I Can Breathe is entitled to an award of reasonable attorneys' fees, and in that respect the parties are ordered to comply with the procedural requirements of this District Court's LR 54.3 (but under *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988) this order does not impair the finality of the judgment ordered in the preceding two sentences).