FOURTH DIVISION

December 21, 2000

No. 1-99-3830

MARTHA ELLEN WYNNE, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

) 

)

)

LOYOLA UNIVERSITY OF CHICAGO, an Illinois ) Honorable Judith Cohen,

not-for-profit corporation, ROBERT ROEMER, and ) Honorable Sophia Hall,

JOY J. ROGERS, ) Judges Presiding.

)

Defendants-Appellees. )

JUSTICE SOUTH delivered the opinion of the court:

Plaintiff, Martha Ellen Wynne, filed this lawsuit seeking damages based upon claims for defamation 
per se
 (count I), defamation 
per quod
 (count II), false light (count III), public disclosure of private information (count IV), intentional infliction of emotional distress (count V) and negligent infliction of emotional distress (count VI).   Defendants filed a motion for summary judgment which was granted in favor of all defendants on all six counts.  Plaintiff filed a motion to reconsider and that motion was denied.  Plaintiff appeals both of these orders, as well as the denial of her motions to reopen discovery, a motion to reconsider that ruling and to obtain additional discovery pursuant to Illinois Supreme Court Rule 191(b) (134 Ill. 2d R. 191(b)).

The issues presented for review are (1) whether the trial court properly granted summary judgment in favor of defendants on all six counts of plaintiff's second amended complaint; and (2)
 whether there was a manifest abuse of discretion in the trial court's refusal to extend discovery past the cutoff or in the denial of plaintiff's motion for additional discovery pursuant to Supreme Court Rule 191(b).

In 1989, defendant Robert Roemer joined Loyola as the Dean of the School of Education and served in that position until 1996.  As dean, Roemer was responsible for managing the School of Education, which also  included the resolution of disputes between faculty members.  He reported directly to Loyola's vice president and Dean of Faculties, James Wiser.  One of Wiser's responsibilities was to help deans and department chairs resolve faculty disputes.  Wiser was assisted with these responsibilities by Lorraine Serwatka, the Associated Vice President for Faculty Administration. 

In the fall of 1993, Loyola was considering a reorganization of its School of Education to centralize all programs related to teacher education into one department, to be called the “Curriculum Instruction and Educational Psychology Department” (CIEP Department).   Among the subjects being discussed was the selection of a chairperson for the new department. 

Dean Roemer thought Wynne would be a good department chair for the new CIEP Department and asked if she was interested.    Although Wynne said that she was not, Roemer stated that he hoped to change her mind.  

In January 1994, Loyola formally announced its plans to reorganize the School of Education and, among other things, create the CIEP Department.  The change would take effect in the fall term of 1994.  Both Wynne and defendant Joy Rogers taught core courses central to the teacher-education curriculum and both were assigned to CIEP. 

Sometime in January 1994, Rogers heard from one of her CIEP colleagues, Ronald Morgan, that Wynne was interested in becoming the chair of the CIEP Department and had Roemer's support.   Rogers then called another CIEP colleague, Jack Kavanagh, who also told Rogers that he had heard about Wynne's possible candidacy for chair.    Rogers then spoke with a senior member of the CIEP Department, Barney Berlin, who confirmed that he had heard similar talk.

Rogers believed that Wynne would be an unsuitable chair and wanted to inform new members of the CIEP Department the reasons for her belief.   On or about February 2, 1994, Rogers composed a memorandum to Barney Berlin about Wynne's fitness to serve as chair of the CIEP Department.  She addressed the memorandum to Berlin because he was to be the most senior professor in the CIEP Department and knew many of the newer faculty members who would be asked to assess Wynne's candidacy.

The memorandum discussed how, over the 15 years that Rogers and Wynne worked at Loyola, Wynne brought personal problems, including her fertility and psychiatric difficulties, into the workplace and how, in Roger's opinion, Wynne could not work well with colleagues.  Rogers reported that Dr. Hablutzel told her about calls from Wynne requesting that she and Dr. Harding come to her home and chase her around to give her injections of a fertility drug.  Rogers stated that Wynne had called her, as well as Drs. Harding and Hablutzel, informing them that she was on the inpatient psychiatric unit at Evanston Hospital due to a sleep disorder.  When Wynne appeared at work within a day or two after these calls, she stated she had signed herself out of the hospital because they had failed to help her sleep.  Wynne asked Rogers to provide her with a copy of the Illinois Mental Health Code Confidentiality Act which Wynne stated was for the purpose of learning how to obtain copies of her psychiatric records.  Rogers also complained about Wynne's stewardship of a new M.Ed. program in the CIEPS department, which Rogers stated was never approved by CIEPS.    Rogers also discussed what she saw as Wynne's longtime tendency to “wheedle, persuade, nag, and domineer for incremental changes ***,” although “nothing ever seemed to satisfy her.”   Rogers believed that “[t]here seemed no room for compromise or consensus building.”   Rogers concluded by listing those traits which she considered essential for effective leadership of a department and concluding that Wynne lacked those traits.

Rogers faxed the memorandum to Berlin at the department fax machine in the Loyola Skyscraper Building.   This machine was used by Loyola faculty and Loyola employees who worked in the building. 

The memorandum was retrieved from that fax machine by Sister Mary Wojnicki, a Loyola staff member in the School of Education.   Wojnicki telephoned the chair of her department, Judith Ingram, at home that same evening to report finding the memorandum.  Wojnicki copied the memorandum and placed the original in a blue “confidential” envelope for Barney Berlin, the intended recipient.  Ingram arranged to meet Wojnicki the next morning to retrieve the one copy. 

The next morning, prior to Ingram's meeting with Wojnicki, Ingram received a phone call from Wynne.  Wynne informed Ingram that another Loyola employee, Janet Pierce-Ritter, had found the first page of the Rogers memorandum in the copy machine and had telephoned Wynne to report the discovery.  Wynne directed Ingram to place the entire Rogers memorandum in a blue “confidential” envelope and give it to Pierce-Ritter for delivery to Wynne, which Ingram did.

After speaking with Wynne, Ingram called Roemer to report the incident. Roemer was attending a meeting with Wiser and other administrators at Loyola's Water Tower Campus.  After conferring with Lorraine Serwatka, Loyola's Associate Vice President of Faculty Administration, Roemer asked Ingram to fax a copy of the memorandum to Serwatka, who waited over the fax machine to receive it.  Roemer himself did not see the Rogers memorandum until he returned to the School of Education.  At that time, he reviewed the memorandum with Ingram, but Ingram kept the one copy. 

Wynne called Roemer to complain about the content of the Rogers memorandum and the method by which it had been transmitted.  Roemer expressed his view that the Rogers memorandum said more about Rogers than it did about Wynne.  When Wynne still remained upset, Roemer conferred with Wiser about how to allay Wynne's concerns.  He explained the circumstances generally but did not give Wiser a copy of the memorandum. 

Roemer met with Rogers, who brought her colleague, Professor Jack Kavanagh, to the meeting.  During the meeting, Rogers maintained that the statements in the memorandum were true.    Roemer informed Rogers that he viewed the method of transmission as inappropriate. 

Wynne claims that after she learned of the existence of the memorandum, it was difficult to work around CIEP co-workers.   In fact, she became nauseated to the point of vomiting because she thought her co-workers had read the memorandum.   Wynne's symptoms worsened during the spring of 1994, abated over the summer months but worsened again when Loyola's next semester started in the fall of 1994.    On August 24, 1994, Wynne skipped the faculty meeting for the School of Education because she felt ill. 

At this time, Wynne and Professor Allan Ornstein, the Acting Chair of the CIEP Department, developed a disagreement.  They met once, shortly after the August 24, 1994, faculty meeting and argued about whether Wynne should be required to attend department meetings, which Wynne claimed made her “symptomatic.”   Wynne never attended a CIEP Department meeting that semester.   Ornstein, treated these absences as “unexcused,” and Wynne eventually complained to Roemer about Ornstein's insistence that she attend CIEP Department meetings.    Roemer granted Wynne an exemption from attendance at department meetings because of her condition.   However, her symptoms continued to worsen, and on January 15, 1995, Wynne's psychiatrist requested a medical leave for her.

Wynne filed her complaint on December 21, 1994.  In response to defendants' motion to dismiss the original pleading, Wynne withdrew her original complaint.  She then filed her first amended complaint on May 9, 1995.   Defendants moved to dismiss that complaint and, on November 21, 1995, the trial court granted the motion as to Loyola, ruling that the Illinois Worker's Compensation Act barred all of Wynne's claims against her employer.    Wynne filed the present complaint on December 19, 1995.

Shortly after Wynne filed her first complaint, her original counsel withdrew, and the firm of Michael H. Postilion Ltd. substituted in as counsel for Wynne.    The Postilion firm withdrew in January 1998, after two depositions had been concluded.   After a period of time, the firm of Susan E. Loggans & Associates substituted in on behalf of Wynne.  The Loggans firm represented Wynne through the close of discovery on February 1, 1999. 

In the course of discovery, Wynne entered into a stipulation and filed responses to Loyola's requests to admit, in which she admitted the following facts:

“Wynne was a psychiatric inpatient at Evanston Hospital;

Wynne experienced sleeping difficulties that caused her to admit

herself as a psychiatric inpatient;

Wynne had fertility problems;

Wynne took injections of infertility medication;

To accommodate her fear of injections, Wynne had someone hold

her while she received infertility injections;

Another Loyola professor, Dr. Nancy Hablutzel, assisted Wynne

with the infertility injection procedure, which Wynne admits was

'strange';

Wynne discussed her fertility problems with her colleagues at 

Loyola.”

Prior to discovery closing in February of 1999, Wynne admitted that she urged her colleague Carol Harding to read the Rogers memorandum, even though Harding was not involved in the initial incident. Harding initially refused to read the memorandum, but Wynne insisted that she do so, and this was how Harding learned that Wynne had been an inpatient in a psychiatric ward.  

By the end of fact discovery, the parties had deposed 12 different Loyola witnesses, all but two of whom were taken on notices issued by defendants.  By January 1997, Wynne had noticed the depositions of eight Loyola witnesses, including Sister Mary Wojnicki, Lorraine Serwatka and Allan Ornstein.  

On December 22, 1998, the court set a final discovery deadline for February 1, 1999, with dispositive motions to be filed shortly thereafter.  Wynne did not pursue any depositions or initiate any discovery between December 22, 1998 and the February 1, 1999, cutoff.  The day after discovery closed, February 2, 1999, Wynne's counsel, Susan E. Loggans & Associates, moved to withdraw.    Nearly two months later, Catherine Postilion sought leave to substitute back in as Wynne's counsel.  The court permitted this supplemental appearance on the express condition that it would not delay the case any further.   The court granted the motion on March 22, 1999, and set new deadlines for Wynne's responses to the overdue damage discovery requests and the requests to admit.  When Wynne's counsel sought permission during that same hearing to reopen fact discovery, however, the court refused this request as untimely.  The court cautioned Postilion that there would be no extensions based on prior counsel's strategic decisions, which plaintiff's counsel acknowledged. 

On April 19, 1999, Wynne moved for reconsideration of the trial court's refusal to reopen discovery and asked to depose three Loyola witnesses (Sister Wojnicki, Serwatka, and Ornstein) and one third-party witness (Phillip Hablutzel).   Wynne had not noticed up that motion for hearing at the time defendants moved for summary judgment on all counts on May 10, 1999.

On May 27, 1999, Wynne filed a Rule 191(b) motion to depose Wojnicki, Serwatka, Ornstein, and Hablutzel.  She did not notice up that motion for immediate hearing, instead waiting until one week before the summary judgment motions were fully briefed.

On July 19, 1999, the trial court denied both Wynne's Rule 191(b) motion and motion to reconsider the court's refusal to reopen discovery.  The court found Wynne's requests for discovery untimely and reminded Wynne that she had years to take the requested depositions before discovery closed.  Turning to Wynne's Rule 191(b) motion, the court ruled that Wynne's "affidavit does not contain the necessary disclosures required under the rule."   The court also ruled that "plaintiff has had ample opportunity to discover facts in opposition to defendant's motion for summary judgment."    In addition, the court found that additional discovery might prejudice defendants, who had spent considerable time and money completing discovery and briefing the summary judgment motions based on the factual record as it stood on May 10, 1999, which could jeopardize the existing trial date. 

On July 21, 1999, the court entered summary judgment in favor of all defendants on all counts of the complaint.  On August 18, 1999, Wynne moved to reconsider the trial court's decision, which the court denied.   

Plaintiff first argues that the trial court erred in granting summary judgment as to all six counts of her second amended complaint.  Defendants respond that since there was no genuine issue of material fact, they were entitled to summary judgment.

The purpose of a summary judgment is not to try an issue of fact, but to determine whether a triable issue of fact exists.  
Bokodi v. Foster Wheeler Robbins, Inc.,
 312 Ill. App. 3d 1051, 1057, 728 N.E.2d 726 (2000).  Summary judgment is a drastic means of disposing of litigation and should be employed only when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  
Bloom Township High School v. Illinois Commerce Comm'n
, 309 Ill. App. 163, 177, 722 N.E.2d 676 (1999).  

Under counts I (defamation 
per se
) and II (defamation 
per quod
), plaintiff is required to prove that defendant made a false statement concerning plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by defendant and that plaintiff was damaged.  
Cianci v. Pettibone Corp.
, 298 Ill. App. 3d 419, 424, 698 N.E.2d 674 (1998).  Statements can be either defamatory 
per quod
, 
i.e.
, requiring extrinsic facts to explain the defamatory character of the statements, or defamatory 
per se.
  
Kolegas v. Heftel Broadcasting Corp.
, 154 Ill. 2d 1, 10, 607 N.E.2d 201, 206 (1992).  Four categories of statements are considered defamatory 
per se
: (1) words that impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office of employment; and (4) words that prejudice a party, or impute a lack of ability, in his or her trade, profession, or business.  
Bryson v. News America Publications, Inc.
, 174 Ill. 2d 77, 88, 672 N.E.2d 1207 (1996).  Wynne contends that the statements imputed an inability to perform her job as a professor at Loyola.

One who publishes a defamatory statement of fact is not subject to liability for defamation if the statement is true.  
Parker v. Bank of Marion
, 296 Ill. App. 3d 1035, 1038, 695 N.E.2d 1370 (1998).  Only “substantial truth” is required for this defense.  
Cianci
, 298 Ill. App. 3d at 424, 698 N.E.2d 674.  While substantial truth is normally a question for the jury, where no reasonable jury could find that substantial truth had not been established, the question is one of law.  
Hollymatic Corp. v. Daniels Food Equipment, Inc.
, 39 F. Supp. 2d 1115 (N.D. 1999).

Defendants contend that since Wynne has admitted certain facts in the Rogers memorandum, she cannot support her defamation claims.  Indeed Wynne has admitted the following: that she was a psychiatric inpatient at Evanston Hospital; that her sleeping difficulties caused her to admit herself as a psychiatric inpatient; that she had fertility problems and took injections of infertility medication; that her fear of injections required that someone hold her while she received infertility injections; that fellow Loyola professor, Dr. Nancy Hablutzel, assisted Wynne with her infertility injections and that Wynne found this to be “strange”; and that Wynne discussed her fertility problems with her coworkers at Loyola.  Inasmuch as Wynne admits the foregoing facts, and inasmuch as the contents of the Rogers memorandum are “substantially true,” her defamation claims must fail.

In addition, a “pure opinion” contained in the memorandum is not actionable.  While in one sense all opinions imply facts, the question of whether a statement of opinion is actionable as defamation is one of degree; the vaguer and more generalized the opinion, the more likely the opinion is nonactionable as a matter of law.  
Hopewell v. Vitullo
, 299 Ill. App. 3d 513, 521, 701 N.E.2d 99, 105 (1998).

Rogers, in her memorandum, made the following statements about Wynne: that Wynne made “bizarre telephone calls” to other colleagues regarding her infertility injections; Wynne's calls to her [Rogers] home after 10 p.m. “seemed inappropriate”; Wynne “appeared to wheedle, persuade, nag, and domineer” for changes in Loyola's Special Education Program; that “nothing ever seemed to satisfy [Wynne]”; Rogers found meetings involving Wynne to be “uniformly unpleasant”; Wynne molded the Special Education Program “into her own view” which was “totally repugnant” to Rogers; that Wynne “began striking various deals” with Dean Roemer; and that Rogers “had to reach outside Loyola in order to get a fair hearing.”

The emphasis in the test for determining the actionability of an allegedly defamatory statement of opinion is on whether the statement contains an objectively verifiable assertion.  
Hopewell
, 299 Ill. App. 3d at 519, 701 N.E.2d 99.   None of the words and phrases used by Wynne are capable of verification.  In addition, Rogers at the start of her memorandum cautions that what follows “is simply a summary of my own feelings about my experiences with Dr. Wynne,” and concludes that “[b]ased on my experiences, I don't believe that Dr. Wynne could be that type of chairman” that Rogers would seek.  It is clear that Rogers was merely expressing her opinions in the memorandum.

Rogers also states the following in her memorandum concerning Wynne's stewardship of the Special Education Program:

“What began as a singularly forward-looking special education program

was gradually devolving into the kind of program which might have 

operated prior to the 1975 passage of a major federal law in the field.”

This statement should also be construed as Rogers' opinion of how Wynne was running the Special Education Program, and as such, is not actionable, nor do we look upon it as accusing plaintiff of violating a federal law, as argued in plaintiff's brief.

Counts III and IV of Wynne's complaint allege false light invasion of privacy and public disclosure of private information, respectively.

A successful cause of action for the public disclosure of private facts requires the plaintiff to prove that:  (1) publicity was given to the disclosure of private facts; (2) the facts were private and not public facts; and (3) the matter made public would be highly offensive to a reasonable person.  
Johnson v. Kmart Corp.
, 311 Ill. App. 3d 573, 579, 723 N.E.2d 1192 (2000).   In a case involving the public disclosure of private facts, “publicity” means “communicating the matter to the public at large or to so many persons that the matter must be regarded as one of general knowledge.”  
Roehrborn v. Lambert
, 277 Ill. App. 3d 181, 184, 660 N.E.2d 180 (1995) (citing Restatement (Second) of Torts §652D, comment a, at 384).  If a plaintiff has a special relationship with the individuals to whom the matter was disclosed, the publicity requirement may be satisfied by disclosure to a small number of people.  
Miller v. Motorola, Inc.
, 202 Ill. App. 3d 976, 980, 560 N.E.2d 900 (1990).   Defendants argue that there was no publicity because the disclosures were limited.  However, the rationale behind the rule that disclosure to a small number of people may satisfy the publicity requirement, is that disclosure to a small group may be just as devastating to the person.  
Miller
, 202 Ill. App. 3d at 980, 560 N.E.2d 900. 

Wynne must establish that the facts disclosed were private, not public.  Wynne only told a few colleagues, some of whom she identified as friends, about her infertility problems and her in-patient psychiatric care.  She  asked Hablutzel, a colleague, to sit on her back while she (Wynne) received an injection.  She called Rogers from the hospital to tell her that she had admitted herself for treatment.  While these were certainly private facts, plaintiff, in disclosing them to her colleagues, did not keep them private.   Since Wynne voluntarily disclosed these private facts to her colleagues, those facts lost their private nature.  
Chisholm v. Foothill Capital Corp.
, 3 F. Supp. 2d 295 (N.D. Ill. 1995).

In addition, the publication element of public disclosure was too limited to support this action.  For these reasons, the ruling of the trial court should be affirmed as to count IV. 

We now address Wynne's claim of “false light.”  The three elements of “false light” are that: (1) plaintiff was placed in a false light before the public as a result of defendant's actions; (2) the false light would be highly offensive to a reasonable person; and (3) the defendant acted with actual malice, with knowledge of or reckless disregard for the falsity of the statements.  
Dubinsky
, 303 Ill. App. 3d at 330, 708 N.E.2d 441 (1999).  Wynne cannot prevail on her false light claim because while there was publication, the assertions made in the Rogers memorandum were “substantially true.”

In count V, plaintiff alleges that defendants committed intentional infliction of emotional distress by, among other matters, publishing the Rogers memorandum, by declining to transfer her to another department, and by appointing a department chair whom she disliked.

A cause of action for intentional infliction of emotional distress is stated when the plaintiff alleges facts that establish (1) the defendant's conduct was extreme and outrageous; (2) the emotional distress suffered by the plaintiff was severe; and (3) the defendant knew that severe emotional distress was certain or substantially certain to result from such conduct.  
Johnson
, 311 Ill. App. 3d at 580, 723 N.E.2d 1192.

In this case, while the Rogers memorandum might be embarrassing to plaintiff, it did not reach the level of “extreme and outrageous” conduct as contemplated by case law.  Nor has Wynne established that she suffered severe emotional distress as required by element two.  Plaintiff has also failed to establish her intentional infliction of emotional distress claim as to Roemer or Loyola.  None of plaintiff's allegations concerning Roemer (declining to transfer Wynne to the department of her choice; appointing a temporary department chair with whom she clashed; “republishing” the Rogers memorandum to his superiors; permitting the appointment of Rogers to committees where she might have power over Wynne) rise to the level of outrageous conduct.  Loyola did not act outrageously by appointing Ornstein as acting chair of Wynne's department, a person with whom she clashed.  Since Wynne did not raise a genuine issue of material fact, the trial court was correct in granting summary judgment in favor of all defendants as to count V.

In count VI, Wynne seeks to hold Roemer and Loyola liable for failing to secure the department fax machine.   Wynne alleged that defendants breached a duty to her by failing to take adequate steps to ensure the privacy of the documents received on the fax machine.  However, the document in question was not defamatory and its dissemination did not constitute a false light invasion of privacy or a public disclosure of private information.  Therefore, summary judgment was properly granted as to count VI since defendants did not breach any duty owed to Wynne by failing to keep the document private.

Next, Loyola contends that the Workers' Compensation Act (the Act),  bars Wynne's cause of action against Roemer and Loyola.  Plaintiff argues that the exclusivity provisions of the Act do not bar a common law cause of action against an employer for injuries which the employer or its alter ego intentionally inflict upon an employee or which were commanded or expressly authorized by the employer.

Since summary judgment was entered in favor of defendants on counts I through VI, the trial court found that defendants had no liability.  We have now affirmed the trial courts judgment.  Thus, there is no need to discuss whether Loyola or Roemer were immune from a liability which did not exist.

Wynne next contends that the trial court's enforcement of the discovery cutoff kept her from deposing four material witnesses.  Defendants reply that plaintiff had more than three years of discovery.

In the area of pretrial discovery, the court's discretionary powers are extremely broad.  
Popeil v.
 
Popeil
, 21 Ill. App. 3d 571, 573-74, 315 N.E.2d 629 (1974).    Absent a manifest abuse of discretion, the pretrial discovery rulings of the circuit court will not be interfered with on appeal.  
Habitat Co. v. McClure
, 301 Ill. App. 3d 425, 444, 703 N.E.2d 578 (1998), 

Here, the record discloses that Wynne knew all four material witnesses well before discovery closed.  Wynne noticed up Serwatka, Wojnicki and Ornstein in 1996.  She knew of the need for Phillip Hablutzel, husband of Nancy Hablutzel, in the fall of 1998, yet she took no action to obtain his deposition prior to the close of discovery on February 1, 1999.  Since Wynne had more than three years to conduct discovery of at least three of the four witnesses, the trial court's denial of her request for additional discovery was not an abuse of its discretion.

Plaintiff's final argument is that the trial court erred in denying her motion for additional discovery pursuant to Supreme Court Rule 191(b) (134 Ill. 2d 191(b)), which specifies the procedure to be followed where additional discovery is needed in regard to summary judgment proceedings.

Illinois Supreme Court Rule 191(b) provides as follows:

“(b) When Material Facts Are Not Obtainable by Affidavit.  If the affidavit of either party contains a statement that any of the material facts which ought to appear in the affidavit are known only to persons whose affidavits affiant is unable to procure by reason of hostility or otherwise, naming the persons and showing why their affidavits cannot be procured and what affiant believes they would testify to if sworn, with his reasons for his belief, the court may make any order that may be just, either granting or refusing the motion, or granting a continuance to permit affidavits to be obtained, or for submitting interrogatories to or taking the depositions of any of the persons so named, or for producing papers or documents in the possession of those persons or furnishing sworn copies thereof.  The interrogatories and sworn answers thereto, deposition so taken, and sworn copies of papers and documents so furnished, shall be considered with the affidavits in passing upon the motion.”  134 Ill. 2d 191(b).

The trial court found that plaintiff's motion was “fatally defective” for two reasons: (1) she did not allege that the witnesses she seeks to depose are the “only” persons with knowledge of any material facts; and (2) plaintiff only alleged in a general sense that Phillip Hablutzel, Wojnicki, Serwatka, and Ornstein had information relevant to her claim and that she would be prejudiced in her ability to respond to defendant's motions for summary judgment without their depositions.  Failure to comply with Rule 191(b) defeats an objection on appeal that insufficient time for discovery was allowed.  
Giannoble v. P&M Heating and Air
 
Conditioning, Inc.
, 233 Ill. App. 3d 1051, 1064, 599 N.E.2d 1183 (1992).  Since Wynne's affidavit does not contain the necessary disclosures required under the rule, the trial court properly denied Wynne's motion for additional discovery pursuant to Rule 191(b).

Based upon the foregoing analysis, the judgment of the circuit court is affirmed.

Affirmed.

HOFFMAN and BARTH, JJ., concur.