Steven L. KARRAKER, Michael A. Karraker, and Christopher M. Karraker, Plaintiffs,

v.

RENT–A–CENTER, INC., J. Ernest Talley, and Associated Personnel Technicians, Defendants.

No. 02–2026.

United States District Court, C.D. Illinois, Urbana Division.

May 6, 2004.

William Riback, Esq., Mary Lee Leahy, Camden, NJ, Leahy Law Offices, Springfield, IL, for Plaintiff.

Franklin E. Wright, Esq., Lorna K. Geiler, Esq., Winstead, Sechrest & Minick, Dallas, TX, Meyer Capel P.C., Champaign, IL, for Defendant.

## OPINION

McCUSKEY, District Judge.

In an effort to avoid unnecessarily proceeding to trial on claims with no issues of disputed fact, both parties have filed motions for summary judgment. Defendant Rent–A–Center, Inc. (RAC) filed a motion for summary judgment (# 133), memorandum in support (# 134), and statement of facts (# 135), asking that this court enter judgment in its favor on some of Plaintiffs' claims.[1] Defendant Associated Personnel

---

1. Several exhibits included with RAC's motion for summary judgment were sealed upon request of Plaintiffs. Those exhibits are docketed as # 160.

Technicians (APT) joined in RAC's motion (# 158).

Plaintiffs have responded to RAC's motion (# 178), and also seek partial summary judgment as to their Americans with Disabilities Act (ADA) claim. They filed a motion explaining the reasons they believe they are entitled to judgment (# 153), a memorandum in support (# 157), and sealed exhibits (# 159). RAC responded to Plaintiffs' motion (# 171) and statement of facts (# 169), and it filed a memorandum in support of its response (# 172).[2] Additionally, RAC filed a reply to Plaintiffs' response to its original motion (# 182) and a reply to the facts Plaintiffs included in their response (# 181). And finally, Plaintiffs filed a reply in support of their motion for summary judgment (# 180).

In amongst the disputes about the merits of the claims, the parties are also arguing about whether certain declarations are properly before this court. Specifically, Plaintiffs filed two motions to strike (# 147 and # 149) and the obligatory memoranda in support (# 148 and # 150), to which RAC responded (# 163 and # 165). Those motions will be addressed at the outset of this order to clarify which exhibits the court considered in deciding the summary judgment issues.

## BACKGROUND

Only a brief recitation of the facts is needed at this point. For a period of time, RAC required all employees or outside applicants seeking management positions ·to submit to a battery of nine separate written tests, commonly referred to as the Management Test. One of the individual exams included in the Management Test

was the Minnesota Multiphasic Personality Inventory I (MMPI).

In the complaint, Steven Karraker alleged that the MMPI and Defendants' treatment of the results violated the ADA. Some of these claims have been dismissed while some have been incorporated into a class action. Specifically, Steven's claims of retaliation and failure-to-promote have been dismissed, his claim that the administration of the test and the maintenance of the test results violated the ADA is part of the class action proceeding, and his termination claim remains pending but is not part of the class action (# 151).

In addition to Steven's ADA claim, all three Plaintiffs raised several state law claims, and the status of those claims is as follows:

- Fair Credit Reporting Act claim—dismissed (# 70)
- Illinois Mental Health and Developmental Disabilities Confidentially Act claim—still pending and part of the class action (# 151)
- Illinois Clinical Psychology Licensing Act claim—still pending and part of the class action (# 151)
- State law right to privacy claims— dismissed except for the public-disclosure-of-private-facts claim (# 70) and part of the class action (# 151)

## MOTIONS TO STRIKE

Plaintiffs have filed two motions to strike, arguing that certain declarations RAC attached as part of its motion for summary judgment are improper. Specifically, Plaintiffs assert that the declarations of Bill Nutt, Joe Kromer, Dr. Koransky,

---

**2.** It appears that # 170 and # 172 are the same document, RAC's Memorandum in Support of Response to Plaintiffs' Motion for Partial Summary Judgment. Based on the signa-

tures on the last page of the filings, this court concludes that # 172 is the original, and so # 170 will be stricken as a duplicative filing.

and Michael Walter should be stricken because they are not sworn or notarized, because RAC failed to disclose information contained therein, and because Walter lacks foundation to be an expert.

■ Motions to strike, when used as a vehicle to delay proceedings, are generally disfavored, *Heller Financial, Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir.1989), and this court retains discretion in ruling on such motions, *see Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir.2002).

In response to Plaintiffs' assertions that the declarations must be stricken because they are unsworn, Defendants have correctly identified the portion of the United States Code that allows such declarations. Specifically, 28 U.S.C. § 1746 provides that unsworn declarations signed under penalty of perjury are acceptable, and such documents have been upheld as admissible in summary judgment proceedings, *Woods*

*v. City of Chicago*, 234 F.3d 979, 987 (7th Cir.2000).

Plaintiffs' attacks on the declarations of Nutt and Kromer appear to be moot given this court's ruling on RAC's prior motion for summary judgment and the content of the current motion for summary judgment. After reviewing Koransky's declaration, this court does not find it to be so inconsistent with his deposition that it must be stricken. And according to RAC's representations, Walter is not an expert and indeed seems to be testifying from his own personal knowledge.

For these reasons, Plaintiffs' motions to strike (# 147 and # 149) are denied.

## ADA CLAIMS [3]

In the context of employment, the ADA prohibits discrimination against "a qualified individual with a disability . . . in regard to job application procedures, the

---

3. Section 12112 of the ADA provides, in relevant part:

(a) General rule

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. . . .

(d) Medical examinations and inquiries

(1) In general

The prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries.

(2) Preemployment

(A) Prohibited examination or inquiry

Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability. . . .

(3) Employment entrance examination

A covered entity may require a medical examination after an offer of employment

has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—

(B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that—

(i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations. . . .

(4) Examination and inquiry

(B) Prohibited examinations and inquiries

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity. . . .

(C) Information obtained . . . are subject to the requirement[ ] of subparagraph[ ](B) . . . of paragraph (3).

hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Concerning medical examinations and inquiries, the statute sets forth the general statement that "[t]he prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries." § 12112(d)(1). The ADA also requires that any information concerning medical condition or history collected by employers must be maintained in separate medical files and must be treated as confidential, subject to work restrictions of which supervisors would need to be aware. § 12112(d)(3)(B)(i); § 12112(d)(4)(C).

RAC seeks summary judgment on Steven's[4] claims that it violated the ADA by administering the MMPI and by keeping the test results in a non-confidential manner. RAC argues that the MMPI is not a "medical examination" subject to the restrictions of the ADA and that Steven failed to show any injury-in-fact. RAC also asserts that Steven lacks standing to seek injunctive relief and that he failed to identify any evidence supporting his claim that his test results were improperly disclosed. Steven also requests summary judgment, arguing that the MMPI is a medical test under the ADA and that the test results were not kept in accordance with ADA requirements.

The parties dispute whether the MMPI is a "medical examination" for purposes of the ADA, and both parties seek judgment on this issue. Steven's claims that RAC administered the MMPI and kept the results in violation of the ADA requirements are based on the premise that the MMPI is a "medical examination" to which the ADA applies. RAC argues that the MMPI does not meet the definition of a "medical examination" and so the ADA prohibition does not apply.

The EEOC, charged with implementing the ADA, *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 693 n. 7 (7th Cir.1998), defines "medical examination" as "a procedure or test that seeks information about an individual's physical or mental impairments or health."[5] The EEOC also provides a list of seven factors to consider in determining whether a particular test is a "medical examination":

(1) whether the test is administered by a health care professional;

(2) whether the test is interpreted by a health care professional;

(3) whether the test is designed to reveal an impairment or physical or mental health;

(4) whether the test is invasive;

(5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task;

(6) whether the test normally is given in a medical setting; and

(7) whether medical equipment is used.

---

**4.** Steven Karraker is the only Plaintiff who filed a charge of discrimination with the EEOC and thus the only Plaintiff who is entitled to raise a claim of discrimination under the ADA. Any references to arguments raised by "Plaintiffs" in this section of the order are made with the knowledge that only Steven has an ADA claim.

**5.** This definition, along with the factors to consider and examples provided by the EEOC, comes from documents entitled "Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)" and "ADA Enforcement Guidance: Preemployment Disability–Related Questions and Medical Examinations." These documents are available in the Publications section of the EEOC website. *See* http://www.eeoc.gov/publications.html.

One factor alone may be enough to classify something as a medical exam, although generally a combination of the factors will be relevant to the analysis. It appears that only one of the seven factors is really at issue in this case—whether the test is designed to reveal mental health impairments.

According to the EEOC, medical examinations include such things as vision tests conducted by an eye doctor, blood and urine tests, blood pressure screening, and x-rays. The EEOC also identified certain procedures that are not considered medical examinations, including physical fitness tests, tests to determine illegal drug use, polygraph examinations, and psychological tests that measure personality traits.

It would seem that the MMPI fits directly into this last example—a psychological test designed to measure personality traits. But the EEOC also notes that psychological examinations that provide evidence that would lead to identifying a mental disorder or impairment should be classified as medical examinations. The EEOC guidelines give several examples that are instructive in analyzing the MMPI:

> Example: A psychological test is designed to reveal mental illness, but a particular employer says it does not give the test to disclose mental illness (for example, the employer says it uses the test to disclose just tastes and habits). But, the test also is interpreted by a psychologist, and is routinely used in a clinical setting to provide evidence that would lead to a diagnosis of a mental disorder or impairment (for example, whether an applicant has paranoid tendencies, or is depressed). Under these facts, this test is a medical examination. Example: An employer gives applicants the RUOK Test (hypothetical), an examination which reflects whether applicants

have characteristics that lead to identifying whether the individual has excessive anxiety, depression, and certain compulsive disorders (DSM-listed conditions). This test is medical.
> Example: An employer gives the IFIB Personality Test (hypothetical), an examination designed and used to reflect only whether an applicant is likely to lie. This test, as used by the employer, is not a medical examination.

Given these parameters for defining a "medical examination," understanding the purpose and use of the MMPI in this case is vital. In discussing precisely how to characterize the MMPI, the parties and this court look to the deposition and declaration of Colin G. Koransky. Koransky has a PhD in clinical psychology and is a licensed Clinical Psychologist and Diplomate of the American Academy of Forensic Examiners. He described the MMPI as a series of 566 true/false questions (only 502 of which were used in the tests given by RAC) designed to measure personality traits and characteristics.

Plaintiffs argue that the MMPI is a medical examination because it is a clinical test for use by medical/psychological professionals. In support of this argument, Plaintiffs identify the eight scores measured by the MMPI: hypochondriasis, depression, hysteria, psychopathic deviate, paranoia, psychasthenia, schizoid tendencies, and mania. Plaintiffs also provide several examples from case law where the MMPI was used to help diagnose mental disorders. Given that the MMPI purports to measure pathological functioning, Plaintiffs argue that it is a medical examination.

RAC does not dispute that the MMPI can be used by medical professionals to aid in mental treatment. RAC argues, however, that the MMPI on its face is not a medical exam because the eight scores are not psychological diagnoses or disorders,

but instead they are personality traits found to some extent in almost everyone. For example, Koransky described that the depression scale measures the extent to which a subject has feelings of depression—unhappiness, pessimism, fatigue, and worry. That score does not refer to any psychological disorder or diagnose a person as being clinically depressed. Koransky discussed each of the eight scores in a similar manner, reiterating that they measure the extent to which a subject has specific personality traits, not whether that person is suffering from a mental disorder.

Additionally, Koransky discussed the various scoring methods for the MMPI and explained that different scoring protocols results in different outcomes for the test. For example, a clinical protocol would be used in clinical practice to develop impressions of clinically relevant behaviors and symptoms. A personnel or "vocational" scoring protocol would look primarily at personality traits that a company would want to know about potential employees. This vocational protocol, used by RAC, does not provide indications that a particular score is high enough to be a possible symptom of a psychiatric illness.

■ ·Although it is true that the MMPI can be used in a clinical setting, it is clear from the evidence in the record that RAC used it solely for the purposes of discerning personality traits of its employees and applicants. Unlike the first example from the EEOC guidelines, this test was not interpreted by psychologists with the intent of diagnosing impairments. Accordingly, it does not qualify as a "medical examination" for purposes of the ADA. RAC is therefore entitled to summary judgment on Steven's claims that it administered the test and kept the test results in violation of the ADA.

## CLINICAL PSYCHOLOGIST LICENSING ACT

Plaintiffs assert that RAC's use of the MMPI constituted malpractice and practicing psychology without a license in violation of the Illinois Clinical Psychologist Licensing Act (CPLA), 225 Ill. Comp. Stat. 15/1–29. The CPLA prohibits engaging in the practice of psychology without a license, § 15/3(a), and it defines "clinical psychology" as "the independent evaluation, classification and treatment of mental, emotional, behavioral or nervous disorders or conditions, developmental disabilities, alcoholism and substance abuse, disorders of habit or conduct, the psychological aspects of physical illness," § 15/2(5). The statute further defines practicing clinical psychology to include "psychoeducational evaluation, therapy, remediation and consultation, the use of psychological and neuropsychological testing, assessment, psychotherapy, psychoanalysis, hypnosis, biofeedback, and behavioral modification" when those practices are used "for the purpose of preventing or eliminating psychopathology, or for the amelioration of psychological disorders of individuals or groups." § 15/2(5).

■ Plaintiffs' main argument in support of this claim is that the MMPI is the most widely used test in regard to adult psychopathologies. It does not appear that RAC disagrees with this contention, but as this court has discussed, the scoring protocol utilized by RAC merely identified personality traits and did not indicate anything in regard to mental disorders. It is clear based on the statutory definitions of clinical psychology that the CPLA was not intended to govern personality tests such as the MMPI as used by RAC. Accordingly, RAC is entitled to summary judgment on this count.

## MENTAL HEALTH & DEVEL-OPMENTAL DISABILITIES CONFIDENTIALITY ACT

Plaintiffs also raise a claim under the Illinois Mental Health and Developmental Disabilities Confidentiality Act (MHDDCA), 740 Ill. Comp. Stat. 110/1–17, arguing that RAC violated the statutory mandate that "[a]ll records and communications shall be confidential and shall not be disclosed except as provided in this Act." § 110/3(a). The MHDDCA defines "record" as "any record kept by a therapist or by an agency in the course of providing mental health or developmental disabilities service to a recipient concerning the recipient and the services provided." § 110/2. The statute further defines "mental health or developmental disabilities services" to include such things as "examination, diagnosis, evaluation, treatment, training, pharmaceuticals, aftercare, habilitation or rehabilitation." § 110/2.

The Plaintiffs again support this claim with the assertion that the MMPI is the most widely used test to determine adult psychopathologies. They argue that the narratives and recommendations accompanying the test scores are therapeutic in nature and so the MHDDCA should apply to RAC's actions.

■ But again, after reading the statutory language, including the definitions, it becomes clear that the MHDDCA was not intended to cover mere personality tests. The MMPI as used here had nothing to do with providing mental health services as defined by the MHDDCA. Instead, the focus was on job-related personality characteristics. RAC is entitled to summary judgment on this claim.

## PUBLIC DISCLOSURE OF PRIVATE FACTS

■ Plaintiffs maintain that the manner in which RAC kept the MMPI test results violated their right to privacy. To state a claim for public disclosure of private facts, the only privacy tort applicable to this case, Plaintiffs must allege (1) publicity was given to the disclosure of private facts; (2) the facts were private and not public facts; and (3) the matter made public would be highly offensive to a reasonable person. *Wynne v. Loyola Univ. of Chicago*, 318 Ill.App.3d 443, 251 Ill.Dec. 782, 741 N.E.2d 669, 676–77 (2000).

■ The publicity element requires that the matter is "made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts, § 652D, cmt. a; *Roehrborn v. Lambert*, 277 Ill.App.3d 181, 213 Ill.Dec. 923, 660 N.E.2d 180, 182 (1995). The requirement may be satisfied, however, by disclosure to a limited number of people with whom the Plaintiffs have a special relationship because the circumstances of that relationship may make the disclosure just as devastating as disclosure to the public at large. *Miller v. Motorola, Inc.*, 202 Ill.App.3d 976, 148 Ill.Dec. 303, 560 N.E.2d 900, 903 (1990). Moreover, disclosure to persons with a "natural and proper interest" in the information is not actionable. *Roehrborn*, 213 Ill.Dec. 923, 660 N.E.2d at 182–83.

RAC argues that Plaintiffs cannot meet the publicity element because they have no actual evidence of improper disclosure of their testing results. RAC asserts that any supervisors properly had access to the MMPI test results for making personnel decisions and that Plaintiffs have not identified any evidence to support their claim that the results were disclosed to other employees at RAC.

Several RAC employees testified about how the test results were maintained. It

appears undisputed that APT mailed the test results to RAC corporate headquarters where they were received by someone in the payroll department. An employee from the payroll department would enter the test results into a computer, and someone would also photocopy the results. The original results were kept at RAC headquarters in employees' personnel files, which were maintained in a filing cabinet. This filing cabinet was located in a cubicle in the payroll department, and persons wishing to view the personnel files (including the MMPI test results) would typically need permission from someone in the payroll department. The filing cabinet remained unlocked during the day but was locked at night. At some point during the relevant time period, RAC headquarters relocated, and at the new building, all personnel records were kept in a locked room.

The photocopy of each employee's test results was placed in a bin designated for the market manager who supervised the store where that particular employee worked. A staff personnel at headquarters would then take all documents in the bin, including any test results, and prepare a package to be sent via UPS. The market managers kept the test results in their office, which was usually an off-site location. Occasionally store managers would request copies of the test results, and those copies would be kept in a file at the store.

■ Plaintiffs claim that, because of these copying/storing/mailing procedures, the test results were not confidential and were therefore being publicly disclosed. But they have no legal authority to support the notion that the possibility of such incidental disclosure satisfies the publicity requirement for an invasion of privacy tort claim. The Illinois Appellate Court addressed a similar claim, finding that the mere possibility that someone might have

seen the communication at issue is insufficient as a matter of law to sustain this claim. *Beverly v. Reinert*, 239 Ill.App.3d 91, 179 Ill.Dec. 789, 606 N.E.2d 621, 626 (1993). "Such possible interception by nobody in particular constitutes neither disclosure to the public (as the Restatement requires) nor disclosure to a limited 'public' with whom the defendant might have a special relationship." *Id.* And indeed a rule that held otherwise would make many forms of confidential communication impossible because any person who sent a fax or opened the mail or placed something in a file or even carried a particular document would be invading someone's privacy.

Plaintiffs do raise a few other factual issues in support of their privacy claim. Steven testified that he discussed test results of other employees with someone from APT over the telephone. He specifically stated that this employee of APT revealed some of the answers a particular person gave on the MMPI concerning, among other things, sexual preferences, hypochondriac tendencies, an urge to steal. Michael testified that the market manager covering his store called him to discuss test results for various employees in that store and, at one point, made a comment about a particular employee worshiping the devil. Chris testified that his store manager discussed in front of a group of employees how everyone did on the tests. Chris stated that this manager made specific comments about him being high strung, drinking less coffee, smoking fewer cigarettes, and drinking more water.

■ Discussions Steven and Michael had regarding the test results of other employees have no bearing on their claims for invasion of privacy. Chris seems to be the only Plaintiff to have identified evidence in the record that information about his test results was conveyed to other employees. But Chris's claim faces yet an-

other problem—the disclosures about which he is complaining are not of a kind to be highly offensive to a reasonable person. The disclosures his store manager made in front of other employees were merely innocuous suggestions regarding general health practices; they were not exceedingly personal problems Chris was facing as revealed by the MMPI. The other plaintiffs mentioned, for example, discussions about sexual practices, devil worshiping, and urges to steal—very different in nature from the standard recommendations to drink more water and cut down on caffeine and nicotine.

The Restatement cautions that "[e]ven minor and moderate annoyance ... is not sufficient to give [someone] a cause of action." Restatement (Second) of Torts, § 652D, cmt. c. That comment to the Restatement provides an example of a public disclosure of a clumsy fall and a broken ankle. The comments made concerning Chris's test results are most analogous to the example given in the Restatement and do not rise to the level of "highly offensive to the reasonable person."

Accordingly, RAC is entitled to summary judgment on all of the Plaintiffs' right-to-privacy claims.

## CONCLUSION

Given this court's rulings, the only remaining claim in this proceeding is Steven Karraker's claim that RAC terminated him in violation of the ADA. This was not a claim on which class certification was granted, and so this case is no longer a class action proceeding. Additionally, this is not a claim relevant to APT and so APT will be terminated as a party in this case.

IT IS THEREFORE ORDERED:

(1) Document # 170 is STRICKEN as a duplicative filing.

(2) The Motions to Strike (# 147 and # 149) are DENIED.

(3) RAC's Motion for Summary Judgment (# 133) is GRANTED. Judgment will be entered in favor of RAC and against Plaintiffs on all claims except Steven Karraker's termination claim.

(4) APT's Motion for Summary Judgment (# 158) is GRANTED. Judgment will be entered in favor of APT and against Plaintiffs on all claims. APT is terminated from this proceeding.

(5) Plaintiffs' Motion for Summary Judgment (# 153) is DENIED.

(6) A telephone status conference is scheduled for 9:30 a.m., Friday, May 21, 2004, in order to set a date for trial on the remaining claim.