# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 04-2881

STEVEN L. KARRAKER, MICHAEL A. KARRAKER,
and CHRISTOPHER M. KARRAKER,

*Plaintiffs-Appellants*,

v.

RENT-A-CENTER, INC., J. ERNEST TALLY, and
ASSOCIATED PERSONNEL TECHNICIANS,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 02 C 2026—**Michael P. McCuskey**, *Chief Judge.*

_____

ARGUED JANUARY 4, 2005—DECIDED JUNE 14, 2005

_____

Before FLAUM, *Chief Judge*, and EVANS and WILLIAMS,
*Circuit Judges*.

EVANS, *Circuit Judge*. To prove their worth prior to the
annual college draft, NFL teams test aspiring professional
football players' ability to run, catch, and throw. But that's
not all. In addition to the physical tests, a draft prospect
also takes up to 15 personality and knowledge tests, an-
swering questions such as:

Assume the first two statements are true.

The boy plays football. All football players wear helmets. The boy wears a helmet.

Is the final statement:

" True?

" False?

" Not certain

They are also asked questions like "What is the ninth month of the year?" *See* Richard Hoffer, "Get Smart!", *Sports Illustrated* (Sept. 5, 1994).

This case involves a battery of nonphysical tests similar to some of those given by NFL teams, though the employees here applied for less glamorous, and far less well-paying, positions. Steven, Michael, and Christopher Karraker are brothers who worked for Rent-A-Center (RAC), a chain of stores that offer appliances, furniture, and other household goods on a rent-to-own basis. During the relevant time, each RAC store had a store manager, several middle managers, and entry-level account managers. Most new employees start as account managers and can progress to upper-level positions. In order to secure a promotion, however, an employee was required to take the APT Management Trainee-Executive Profile, which was made up of nine tests designed to measure math and language skills as well as interests and personality traits.

As part of the APT Test, the Karrakers and others were asked 502 questions from the Minnesota Multiphasic Personality Inventory (MMPI), a test RAC said it used to measure personality traits. But the MMPI does not simply measure such potentially relevant traits as whether someone works well in groups or is comfortable in a fast-paced office. Instead, the MMPI considers where an applicant falls on scales measuring traits such as depression, hypochon-

driasis, hysteria, paranoia, and mania.[1] In fact, elevated scores on certain scales of the MMPI can be used in diagnoses of certain psychiatric disorders.

All parts of the APT Test were scored together, and any applicant who had more than 12 "weighted deviations" was not considered for promotion. Thus, an applicant could be denied any chance for advancement simply because of his or her score on the MMPI. The Karrakers, who all had more than 12 deviations on the APT, sued on behalf of the employees at 106 Illinois RAC stores, claiming RAC's use of the MMPI as part of its testing program violated the Americans With Disabilities Act of 1990 (ADA). They also claimed that RAC failed to protect the confidentiality of the test results in violation of Illinois tort law.

The district court first granted RAC's motion for partial summary judgment on Steven Karraker's failure to promote claim, finding that he did not file his charge of discrimination with the EEOC within 300 days of any alleged discrimination. The court also granted the Karrakers' motion for class certification on the ADA and public disclosure of private facts claims.

---

[1] Applicants were asked whether the following statements were true or false:

"I see things or animals or people around me that others do not see."

"I commonly hear voices without knowing where they are coming from."

"At times I have fits of laughing and crying that I cannot control."

"My soul sometimes leaves my body."

"At one or more times in my life I felt that someone was making me do things by hypnotizing me."

"I have a habit of counting things that are not important such as bulbs on electric signs, and so forth."

The district court later granted RAC's motion for summary judgment and denied the Karrakers' motion for summary judgment on the outstanding claims with the exception of Steven Karraker's wrongful termination claim. The Karrakers stipulated to the dismissal of that claim to allow this appeal to go forward. Here, they challenge the district court's decision that the use of the MMPI did not violate the ADA, the dismissal of Steven Karraker's failure to promote claim, and the dismissal of the Karrakers' claim of public disclosure of private facts. We review the district court's grant of summary judgment *de novo. See Carreon v. Ill. Dep't of Human Servs.*, 395 F.3d 786, 790 (7th Cir. 2005).

Americans with disabilities often faced barriers to joining and succeeding in the workforce. These barriers were not limited to inaccessible physical structures. They also included attitudinal barriers resulting from unfounded stereotypes and prejudice. People with psychiatric disabilities have suffered as a result of such attitudinal barriers, with an employment rate dramatically lower than people without disabilities and far lower than people with other types of disabilities. *See* Jans, Stoddard & Kraus, *Chartbook on Mental Health and Disability in the United States*, U.S. Department of Education, National Institute on Disability and Rehabilitation Research, 2004, figure 11, www.infouse.com.

Congress enacted the ADA, 42 U.S.C. §§ 12101 *et seq.*, to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress recognized that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(8). The ADA's definition of disability is not limited to physical impairments, but also includes mental impairments. 42 U.S.C. § 12102(2). Title I of the ADA, 42 U.S.C. § 12111, is devoted

to eliminating employment discrimination based on actual or perceived disabilities.

Congress enacted three provisions in Title I which explicitly limit the ability of employers to use "medical examinations and inquiries" (42 U.S.C. § 12112(d)(1)) as a condition of employment: a prohibition against using pre-employment medical tests; a prohibition against the use of medical tests that lack job-relatedness and business necessity; and a prohibition against the use of tests which screen out (or tend to screen out) people with disabilities.

At its heart, the issue in this case is whether the MMPI fits the ADA's definition of a "medical examination." In that regard, we note the parties' agreement that, although the Karrakers were already employed by RAC, the tests here were administered "pre-employment" for ADA purposes because they were required for those seeking new positions within RAC. This agreement means we need not determine whether the Karrakers should be considered to be in the pre-employment offer category. Plaintiffs have argued only that the MMPI is a medical examination. RAC could have argued not only that the MMPI is not a medical examination, but also that even if it is, it is "job-related and consistent with business necessity." By prevailing on the latter, defendants could claim that the test is permissible during employment, even if impermissible pre-offer. By not arguing that the test is "job-related and consistent with business necessity," RAC seeks a clear finding that the MMPI is not a medical examination and thus not regulated at all by the ADA.

The EEOC defines "medical examination" as "a procedure or test that seeks information about an individual's physical or mental impairments or health." *See* "ADA Enforcement Guidance: Preemployment Disability-Related Questions and

Medical Examinations" (1995).[2] According to the EEOC, factors to consider in determining whether a particular test is a "medical examination" include:

(1) whether the test is administered by a health care professional;

(2) whether the test is interpreted by a health care professional;

(3) whether the test is designed to reveal an impairment of physical or mental health;

(4) whether the test is invasive;

(5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task;

(6) whether the test normally is given in a medical setting; and

(7) whether medical equipment is used.

"[O]ne factor may be enough to determine that a procedure or test is medical." Psychological tests that are "designed to identify a mental disorder or impairment" qualify as medical examinations, but psychological tests "that measure personality traits such as honesty, preferences, and habits" do not. *Id.*

---

[2] We frequently look to EEOC guidelines for guidance in discrimination cases, which, "while not controlling upon courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986) (internal citations omitted); *see also Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 n.7 (7th Cir. 1998). *But see Toyota Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 194 (2002) ("[W]e have no occasion to decide what level of deference, if any, [applicable EEOC regulations] are due.").

Therefore, this case largely turns on whether the MMPI test is designed to reveal a mental impairment. RAC argues that, as it used the MMPI, the test only measured personality traits. For example, RAC argues in its brief that the MMPI does not test whether an applicant is clinically depressed, only "the extent to which the test subject is experiencing the kinds of feelings of 'depression' that everyone feels from time to time (*e.g.*, when their favorite team loses the World Series)." Although that particular example seems odd to us (can an Illinois chain really fill its management positions if it won't promote disgruntled Cubs fans?), the logic behind it doesn't seem to add up, either. Repeating the claim at oral argument, RAC argued that the MMPI merely tested a "state of mood" and suggested that an applicant might, for example, score high on the depression scale because he lost his keys that morning. But why would RAC care if an applicant lost his keys the morning of the MMPI or took the test the day after another Cubs loss? Would RAC really want to exclude an employee from consideration for a promotion because he happened to feel sad on the wrong day? We see two possibilities: either the MMPI was a very poor predictor of an applicant's potential as a manager (which might be one reason it is no longer used by RAC), or it actually was designed to measure more than just an applicant's mood on a given day.

To help us sort out which of these possibilities is more likely, the EEOC guidelines offer three examples of tests given pre-employment:

> Example: A psychological test is designed to reveal mental illness, but a particular employer says it does not give the test to disclose mental illness (for example, the employer says it uses the test to disclose just tastes and habits). But, the test also is interpreted by a psychologist, and is routinely used in a clinical setting to provide evidence that would lead to a diagnosis of a mental disorder or impairment (for example, whether

an applicant has paranoid tendencies, or is depressed). Under these facts, this test is a medical examination.

Example: An employer gives applicants the RUOK Test (hypothetical), an examination which reflects whether applicants have characteristics that lead to identifying whether the individual has excessive anxiety, depression, and certain compulsive disorders (DSM-listed conditions). This test is medical.

Example: An employer gives the IFIB Personality Test (hypothetical), an examination designed and used to reflect only whether an applicant is likely to lie. This test, as used by the employer, is not a medical examination.

RAC's use of the MMPI almost fits the first example in that it is a psychological test that is designed, at least in part, to reveal mental illness. And RAC claims it uses the test only to measure personality traits, not to disclose mental illness. The parallel falls apart, however, because the test was not interpreted by a psychologist, a difference that led the district court to conclude that it is not a medical examination. In doing so, the district court relied on the deposition testimony of Colin Koransky, a clinical psychologist. Koransky described various scoring methods for the MMPI, explaining that a clinical protocol could be used for medical purposes while a vocational scoring protocol would focus more on personality traits of potential employees. The district court found that, because RAC used the vocational protocol to score the test, RAC used the MMPI "solely for the purposes of discerning personality traits."[3]

---

[3] The Karrakers appealed the district court's denial of their motions to strike declarations by Dr. Koransky and Michael Walter, the president of APT. With our resolution in this case, that issue loses much of its relevance. Thus, we simply will say that the

(continued...)

The mere fact that a psychologist did not interpret the MMPI is not, however, dispositive. The problem with the district court's analysis is that the practical effect of the use of the MMPI is similar no matter how the test is used or scored—that is, whether or not RAC used the test to weed out applicants with certain disorders, its use of the MMPI likely had the effect of excluding employees with disorders from promotions.

Dr. Koransky claims, for example, that the Pa scale "does not diagnose or detect any psychological disorders," but that "an elevated score on the Pa scale is one of several symptoms which may contribute" to a diagnosis of paranoid personality disorder. We accept Dr. Koransky's contention that a high score on the Pa scale does not necessarily mean that the person has paranoid personality disorder. But it also seems likely that a person who does, in fact, have paranoid personality disorder, and is therefore protected under the ADA, would register a high score on the Pa scale. And that high score could end up costing the applicant any chance of a promotion. Because it is designed, at least in part, to reveal mental illness and has the effect of hurting the employment prospects of one with a mental disability, we think the MMPI is best categorized as a medical examination. And even though the MMPI was only a part (albeit a significant part) of a battery of tests administered to employees looking to advance, its use, we conclude, violated the ADA.

---

[3] (...continued)
district court did not abuse its discretion. The Karrakers also argue that there is no evidence to support the district court's conclusion that RAC used a vocational protocol to score the MMPI. As we will describe, the MMPI is a medical examination regardless of the scoring system, so it does not matter which scoring protocol RAC used.

In addition to his ADA claim, Steven Karraker challenges the district court's determination that his failure-to-promote claim was time-barred because he did not file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. The district court granted RAC's motion for summary judgment on the issue, then denied Karraker's Rule 60 motion. Karraker challenges the denial of that Rule 60 motion, so he must show that the district court abused its discretion in order to prevail. *See Easley v. Kirmsee*, 382 F.3d 693, 697 (7th Cir. 2004).

Karraker claims that he did not bother to apply for a promotion during the 300-day period because RAC would not have considered him. As such, he says, the district court should have applied the futile gesture doctrine and allowed his claims. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977) ("When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application."). He also argues that his claims are not time-barred through a "continuing violation theory," which allows a plaintiff in certain situations "to get relief from a time-barred act by linking it with an act within the limitations period." *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992).

"Rule 60(b) relief is an extraordinary remedy and is granted only in exceptional circumstances." *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 131 F.3d 625, 628 (7th Cir. 1997). Since none of Rule 60(b)'s enumerated justifications for relief apply, Karraker can only conceivably be entitled to relief under the catch-all provision, Rule 60(b)(6), and that provision is not an appropriate place to slip in arguments that should have been made earlier. *See Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("Reconsideration is not an appro-

priate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion.").

Although Karraker's failure to make the arguments in a timely fashion is enough to support the district court's decision, his claim also is quite weak on the merits. Karraker testified that the only promotion he wanted while he worked at RAC was filled in March of 1999, more than 2 years before he filed his charge of discrimination with the EEOC. Applying for a promotion would have been futile because there were no jobs available, not because of any discrimination. Therefore, we find no abuse of discretion.

The Karrakers also challenge the district court's dismissal of their tort claim based on the public disclosure of private facts. To prevail, they must show that private facts were made public and that the matter made public would be highly offensive to a reasonable person. *See Wynne v. Loyola Univ. of Chicago*, 741 N.E.2d 669, 676-77 (Ill. App. Ct. 2000). The publicity requirement is satisfied by disclosure to a limited number of people if those people have a special relationship with the plaintiff that makes the disclosure as devastating as disclosure to the public at large. *Miller v. Motorola, Inc.*, 560 N.E.2d 900, 903 (Ill. App. Ct. 1990). Disclosure to persons with a "natural and proper interest" in the information is not actionable. *Roehrborn v. Lambert*, 660 N.E.2d 180, 182-83 (Ill. App. Ct. 1995).

The district court found that the Karrakers failed to produce sufficient evidence of the actual disclosure of their test results. We agree. Much of the Karrakers' claim centered around RAC's handling of the test results, which they claim did not adequately protect their privacy. As the district court described, the test results were kept in a filing cabinet in personnel files, and anyone wishing to view the records needed permission to do so from someone in the payroll department. The filing cabinet was locked at night, and the

records were eventually moved into a locked room. Although someone could have seen the test results sitting in the fax machine or in the personnel file, that possibility is not sufficient to support a claim. *See Beverly v. Reinert*, 606 N.E.2d 621, 626 (Ill. App. Ct. 1993).

The Karrakers provided only vague claims that their test results actually became public, instead noting general discussions about the test results, mostly of other employees. In addition, although the sharing of the full test results likely would be highly offensive to a reasonable person, the Karrakers did not demonstrate that the actual information they claim was shared met that requirement.

The judgment of the district court is AFFIRMED with respect to Steven Karraker's failure to promote claim and the Karrakers' public disclosure of public facts claim. The judgment is REVERSED and REMANDED so that summary judgment can be entered in favor of plaintiffs on their claim that the MMPI is a medical examination under the ADA. Costs on this appeal are awarded to the appellants.

A true Copy:

     Teste:

                       _____
                       *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*